1 | CRAIG P. FAGAN, State Bar No. 149556
**LAW OFFICES OF CRAIG P. FAGAN**
2 | 6320 Raydel Court
San Diego, CA 92120
3 | Telephone: (619) 528-9600
Facsimile:  (619) 528-9675
4 | email: cpfagan@faganlegal.com

5 | Attorneys for all Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN LASS, an Individual; AMY LASS, an Individual; B.L., a minor by and through his general guardian, AMY LASS; C.L., a minor by and through his general guardian, AMY LASS; NATE SPEER, an Individual; MELISSA SPEER, an Individual; R.S., a minor by and through her general guardian, MELISSA SPEER; P.S., a minor by and through her general guardian, MELISSA SPEER; H.S., a minor by and through her general guardian, MELISSA SPEER; BRIAN BURKE, an Individual; TRISHA BURKE, an Individual; J.B., a minor by and through her general guardian, TRISHA BURKE; B.B., a minor by and through her general guardian, TRISHA BURKE;<br><br>        Plaintiffs,<br><br>    v.<br><br>BRINDISI AT AVIARA PREMIER COLLECTION HOMEOWNERS ASSOCIATION; A Business Form Unknown; THE PRESCOTT COMPANIES DOING BUSINESS AS ASSOCIA PRESCOTT, a California Corporation; and DOES 1 THRU 10, INCLUSIVE,<br><br>        Defendants | No. **'17CV2428 WQHBGS**<br><br>**COMPLAINT FOR MONETARY, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY** |

COMPLAINT                                                                                                1

# I.

# INTRODUCTION

1. This action seeks monetary, declaratory, and injunctive relief against defendants for discriminating against families with children in the operation of the community called Brindisi at Aviara, located in Carlsbad, California (hereinafter "the Subject Property" or "the complex") for coercing, intimidating, threatening, or interfering with plaintiffs in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act and/or the Fair Employment and Housing Act in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§3601 *et seq.*, and related federal and state laws.

# II.

# JURISDICTION AND VENUE

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1331 in that the claims alleged herein arise under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in that the claims alleged herein arose within the City of Carlsbad, San Diego County, California.

\* \* \*

\* \* \*

## III.

## **PARTIES**

4. Plaintiffs Amy Lass and Christian Lass, husband and wife, live in Carlsbad, County of San Diego, California, along with her minor children, Plaintiffs B.L. and C.L.. The minor plaintiffs are represented in this case by their general guardian, Amy Lass.

5. Plaintiffs Nate Speer and Melissa Speer, husband and wife, live in Carlsbad, County of San Diego, California, along with her minor children, R.S., P.S. and H.S.. The minor plaintiffs are represented in this case by their general guardian, Melissa Speer.

6. Plaintiffs Brian Burke and Trisha Burke, husband and wife, live in Carlsbad, County of San Diego, California, along with her minor children, J.B. and B.B.. The minor plaintiffs are represented in this case by their general guardian, Trisha Burke.

7. Plaintiffs bring this action on behalf of themselves pursuant to the California Unfair Business Practices Act, California Business & Professions Code Sec. 17200 *et seq*.

8. Defendant Brindisi at Aviara Premier Collection Homeowners Association (Hereinafter "Brindisi HOA"), is a business form unknown, but has as its principal place of business in Carlsbad, San Diego County, California.

9. Defendant The Prescott Companies doing business as Associa Prescott, is a California Corporation, with its principal place of business in Carlsbad, San Diego County, California.

10. Defendants are engaged in the business of managing and supervising the rental and ownership of units at the Subject Property to members of the public.

11. Defendants have employed board members and employees to supervise and enforce the rules at the Subject Property at all times referenced herein.

12. Defendants have employed board members and employees, at all times herein relevant were, the agents, employees, or representatives of all defendants; in doing the acts or in omitting to act as alleged in this complaint, were acting within the course and scope of their actual or apparent authority pursuant to such agency or employment; or the alleged acts or omissions of these individuals as

agents or employees was subsequently ratified and adopted by Defendants as principals.

13. Each defendant is, and at all times herein relevant was, the agent, employee, or representative of each other defendant, in doing the acts or in omitting to act as alleged in this compliant, was acting within the course and scope of his or her actual or apparent authority pursuant to such agency; or the alleged acts or omissions of each defendant as agent were subsequently ratified and adopted by each defendant as principal.

## IV.
## FACTS

14. Defendants, acting individually and in concert with others, directly and through agents, have engaged in a pattern or practice of discrimination against families with children, including Plaintiffs, on account of familial status in the operation of the Subject Property. Defendants continue to engage in such a pattern or practice of discrimination so as to constitute a continuing violation.

15. In 2012, Amy Lass and Christian Lass, husband and wife, purchased a home at the Subject Property. The Lass's lived at the complex with their three minor children, B.L., C.L., and L.L., until moving out in late 2017.

16. In July 2014, Plaintiffs Nate Speer and Melissa Speer, husband and wife, moved into the complex, along with their minor children R.S., P.S. and H.S.

17. In July 2104, Plaintiffs Brian Burke and Trisha Burke, husband and wife, moved into the complex, along with their minor children, J.B. and B.B.

18. During the last several years, all Plaintiffs have been incessantly harassed about their children playing outside in safe common areas. The harassment became so severe, that the Lass Family sold their home and moved from the community in October 2017. Prior to that, in July 2017, the Speer family could no longer take the harassment, as well, so they moved out.

19. On multiple occasions from 2015 until the Lass family moved out in October 2017, they were repeatedly warned by Defendants that their children were not allowed to play in the common

areas of the property. Defendants would send written warning notices, informing the Lass family that their children were interfering with the quiet enjoyment of their neighbors, when such simply was not the case. These warning notices would threaten fines if the children did not stop playing. The Lass children were young, all under 4 years old when the harassment started in 2015. The Lass children would simply play in the quad area, a cement area between the houses which is a perfectly safe area for children to play. Plaintiffs were also warned to stop their children from playing on the sidewalk near their home. As for Plaintiffs' children, they would laugh and have fun, acting like normal children. They would not be creating unreasonable disturbances. When Plaintiffs eventually sold their house in October 2017, they were required to pay off a lien of about $700 that Defendants had placed against their home, for fines levied against them for allowing their children to play outside.

20. In or about 2015, Plaintiff Amy Lass went to a board meeting put on by Defendants, and raised the issue about her children not being allowed to play outside. Ms. Lass stated that it was perfectly safe for kids to play outside, they weren't noisy, and that the children were being unfairly targeted. She asked the board to stop sending them warning letters and making threats of fines if their children played outside. The board ignored her pleas.

21. In the summer of 2017, Plaintiff Christian Lass was outside in his garage, with the door up, when the wife of the president of Brindisi HOA's board, a woman named Trudy, came walking by. On the ground outside Mr. Lass's garage, was a small, plastic shovel, typically used by kids to dig in the sand at the beach. Upon seeing the shovel, Trudy said to Mr. Lass, "You can't have that out here. The kids can't play with shovels here, and they can't play in this area." Trudy gestured toward the quad area, as she made this statement. The quad area is a cement area between plaintiff's houses and their adjoining neighbors houses. The area is a perfectly safe area for children to play.

22. On no fewer that nine occasions from July 2014 to July 2017, Defendants sent written warning notices to Nate & Melissa Speer family, repeatedly threatening them with fines if their children played outside in the common areas. These notices repeatedly warned the Speer family that their children were interrupting the quiet enjoyment of the neighborhood. The notices also specifically noted that children were not allowed to play in common areas, including the cement quad area between Plaintiffs'

house and their adjoining neighbors' houses, as well as instructions to refrain from allowing children to play on a sidewalk near the Speer family unit. These demands were patently unreasonable, as the Speer children were usually engaging in harmless, safe, quiet play activities on these occasions. Such activities would include sitting and playing with dolls, visiting, playing catch with a ball, riding bikes, or just engaging in normal, non-threatening and non-dangerous play activities.

23. On multiple occasions, the Speer family reached out to Defendants, asking why their children were not allowed to play outside, and were the children supposed to do if they could not play. Defendants ignored all inquiries by the Speer family.

24. The Speer family also received written warning that their children were destroying the landscape near their unit, and that play activities had to stop. The threats were unreasonable, as no landscaping in the area had been damaged. Indeed, there is very little landscaping in the area, as it is mostly concrete. The only landscaping in the area consisted of thick bushes and palm trees, none of which had suffered any damage. The threats were simply attempts to keep children from playing, and not any attempt to preserve landscaping.

25. In or about June 2015, the Speer family had a group of young girls over to their house, watching the women's World Cup soccer tournament. At one point, the United States women's team scored a goal. The girls became so excited, that they ran outside and into the quad area, cheering out of excitement that the United States team had scored a goal. The cheering lasted for a minute or two. Unfortunately, during this celebration, an adjoining neighbor came outside, and screamed at the children to stop being noisy. The neighbor's conduct was belligerent and totally unacceptable. The very next day, Defendants sent a letter to the Speer family, indicating that their children were not allowed to make excessive noise in the common areas. The demand was unreasonable, as the children were behaving perfectly well, displaying only a momentary burst of excitement. Defendants threat was bullying and harassment, and further intimidated the Speer family.

26. In or about June 2017, the Speer's 5-year-old daughter, R.S., was riding her bike in a circle in the middle of the quad, as Melissa Speer stood nearby in her open garage, watching. Unfortunately, R.S. turned too quickly, and the bike crashed. R.S.'s foot became lodged between the pedal

and frame. Her mother was not able to remove her foot, and, therefore, had to call the fire department. The fire department came, and extricated R.S.'s foot from the bike, without further incident. R.S. was fine, other than a few scratches. While the fire department was at the scene, a member of Defendant Brindisi HOA's management team, a woman named Donna, came to the scene, and informed the Speers that their children were not supposed to be playing in the common areas. The following day, Defendants sent a letter to the Speers, warning them that children were not allowed to play in the common areas, and that they would be fined if the behavior continued.

27. In May 2016, Nate Speers became overwhelmed by the harassment against his children, and wrote a letter to Defendant Brindisi HOA, informing them that their actions violated fair housing laws. In this letter, he asked to meet with the board, to discuss the problem, to see if there was a workable solution. Mr. Speer's request was ignored by Defendant Brindisi HOA.

28. In October 2016, the Speer family placed decorative cobwebs around their door for Halloween. In response, Defendants sent a letter to the Speer family, informing them that the cobwebs had to come down, since it was touching landscape near the door.

29. Shortly after moving in, Plaintiff Trisha Burke took her children to the community pool on a hot summer day in August 2014. Several other mothers were present with their young children. It was shortly after noon. The kids behaved themselves while swimming, acting like normal kids, laughing, swimming, and having a good time. The next day, Defendants sent a written notice to the Burkes, warning them that excessive noise was not allowed at the pool. The demand was unreasonable, as the kids were very young, and just playing and having fun in the pool. They were not unreasonably noisy.

30. Several weeks later, Mrs. Burke took her two daughters outside, to allow them to ride their bikes in the u-shaped roadway at the complex. As the children rode on the street, Ms. Burke put up a plastic, green crossing guard figure, which had a sign which stated, "Caution: Children at play." Mrs. Burke position the green crossing guard on the edge of a parking stall, making sure that it was visible from , but not in the actual roadway. Mrs. Burke stood outside, while her kids rode bikes and scooters. It was perfectly safe to be riding on this street because it's a tiny little neighborhood. Upon seeing this, one of

Defendant Brindisi HOA's board members came stomping over to the green crossing guard, and moved it up on to the sidewalk. The board member was visibly perturbed by the green crossing guard. The next day, Defendants sent a letter to the Burkes, which letter stated that they had violated community rules by having an obstruction in the street. The warning was patently unreasonable, and was intended to intimidate the Burkes.

31. In response, the Burkes sent a letter to Defendants, indicating that it was safe to play in the street. Also, the letter from the Burkes threatened to sue Brindisi HOA if they did not install speed bumps, and institute a speed limit. Defendants never responded to the letter, but it caused Defendants to stop harassing the Burke children about playing outside for about the next six months.

32. Unfortunately, starting in early 2015, Defendants began to send a regular stream of warning notices to the Burkes, for their children playing. This barrage of notices has continued over the last two years. The notices were sent over a regular basis, having been sent about once or twice a month during the last two years, sometimes more often in a given month. On many of these occasions, the children were riding bicycles, riding scooters, playing catch with a Nerf ball, playing two-square, volleyball, badminton, jump rope, dolls, or simply sitting on a bench in the common area, playing. No activity was safe or too quiet, as far as Defendants were concerned, even though that was not the case. In short, Defendants wrote these baseless letters as a means to intimidate and cause the Burkes to stop their children from playing outside.

33. In summer 2015, the Burkes were outside on a hot summer day. Ms. Burke was busy applying sun tan lotion to B.B., while J.B. was riding her bike on the community road. It was perfectly safe for her to do so. A few moments later, the Burkes left to go to the park. When they returned a few hours later, there was a set of house rules taped to their unit, with a rule highlighted in yellow marker, which highlighted portion indicated that children could not play in common areas. Upon seeing this, Ms. Burke went to a nearby board member's house, and complained about the notice. Mrs Burke asked, "Why do you do this?" The board member said, "You need to leave the neighborhood and go to the park." Mrs. Burke responded by stating that they had just come back from the park. Upon hearing this, the board member said, "Good. That's where you should be."

34.     Thereafter, the Burkes started curtailing the frequency with which their kids would play outside.  Prior to this incident, their kids would play outside every day, for extended periods.  Thereafter, their kids would not play outside for longer than five minutes, as the Burkes were afraid to let their kids play.  Nonetheless, even though the Burkes materially curtailed the time that their kids were outside, Defendants would still continue to send warning notices to the Burkes for their children playing outside.  These notices were patently unreasonable, and were attempts to intimidate and harass the Burkes.

35.     On several occasions in 2015, Ms. Burke spoke with several board members, telling them about the harassment.  The board members claimed that they were not aware of the harassment.  The Burkes asked why this was happening, seeing that they weren't bad people.  At one point, Mrs. Burke said, "Kids should be allowed to play."  The board members claimed not to be aware of the harassment, and never did anything, thereafter, to stop it.  Thereafter, the harassment by Defendants continued.

36.     In 2016, on two or three occasions, J.B. and B.B. walked out their door with their dog and walked about 30 feet to their mailbox.  During these walks, the kids were well-behaved, and their dog was well-behaved, too.  Nonetheless, Defendants sent warning notices to the Burkes, stating that the dogs were trampling landscape and defecating.  The claims were patently false.  This caused J.B. and B.B. to stop walking the dog.  These notices were further attempts by Defendants to harass and intimidate the Burkes into stopping their kids from being outside, and walking their dogs.   By stark contrast, adults in the complex are free to walk their dogs, and let them relieve themselves, without receiving warning notices.

37.     As it stands, families with children are incessantly harassed about kids making noise, when such noise is either non-existent, or involves kids making normal kid-type noises.  As it stands, there is a lady at the complex named Jackie who lives near the Burkes, and even nearer to a board member.  This lady is constantly noisy, plays loud music, and regularly has noisy sex (her windows are open) that can be heard in the neighborhood.  The board member living nearby this lady does nothing to stop the noise, and Plaintiffs are informed and believe and thereon allege that Jackie has never received a noise complaint from Defendants.  In short, whereas children are constantly harassed about minor noise, equally or more noisy adults are not warned.

38. Presently, the Burkes are in the process of moving out due in large part to the harassment from Defendants.

39. The stress from Defendants constant harassment of all Plaintiffs caused extreme emotional distress to the families. Each family constantly battled with the idea of letting their children play outside, and worrying about the consequences if the did so. This stress caused strain on the marriage of all Plaintiffs' families, as well as caused stress in the lives of their respective children. The treatment against Plaintiffs was an attempt to control their children. By stark contrast, adult tenants were freely allowed to use common areas without being confronted by Defendants. To this end, adult residents are always permitted to walk their dogs in common areas, without receiving warnings to stop engaging in such activities. In addition, several adult residents park their cars off-site, on a public street near the complex, then ride their skateboards from their cars, through the community, and to their respective units, without ever being warned by Defendants to stop such activities. Several adult tenants have also consistently ridden their skateboards from their units to the community pool, and rarely have been admonished for riding skateboards. By contrast, whenever a child has ridden a bike or a scooter in a common area at the property, the child has been admonished.

40. During the time that Plaintiffs have lived at the complex, they have all been threatened with fines and with having their cars towed for parking on the driveway, or momentarily stopping to let somebody get out of the car and go into the house. These threats have been repeatedly directed toward Plaintiffs, and visiting family members who might commit a minor parking violation. Indeed, prior to moving out Defendants had the Lass family car towed from a guest parking spot, even though the Lass family had received a parking pass from Defendants, which allowed them to use the space while moving out. Prior to this, members of Brindisi HOA had made it known that they were intent on towing the Lass car at all costs. On another occasion, Defendants had the car of the father of Melissa Speer towed for parking on the driveway. In short, Plaintiffs were constantly harassed by Defendants about parking. Plaintiffs are informed and believe and thereon allege that they were singled out for parking violations because they had complained about unfair treatment of their children. By contrast, adult residents without children constantly park on the driveway, in guest spots, or pull up to drop people off to

their units, and are never admonished by Defendants about committing parking violations.

41. The Subject Property is not designated as an elderly complex.

## V.

## INJURIES

42. By reason of defendants' unlawful acts and practices, plaintiffs have suffered loss of important housing opportunities, violation of their civil rights, deprivation of the full use and enjoyment of their tenancy, and emotional distress and physical injury, humiliation and mental anguish, fear, stress, including bodily injury such as stomach aches; head aches; sleep loss; feelings of depression, discouragement, anger, and nervousness; and reliving the experience; and other special and general damages according to proof. Accordingly, plaintiffs are entitled to compensatory damages.

43. In doing the acts of which plaintiffs complain, defendants and their agents and employees intentionally or recklessly violated plaintiffs' civil rights. Accordingly, all plaintiffs are entitled to punitive damages.

44. There now exists an actual controversy between the parties regarding defendants' duties under the federal and state fair housing laws. Accordingly, all plaintiffs are entitled to declaratory relief.

45. Unless enjoined, Defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination described above.

* * *

* * *

* * *

* * *

* * *

* * *

# VI.

# FIRST CLAIM

# (Fair Housing Act)

46. Plaintiffs reallege and incorporate by reference paragraphs 1 through 45 of the complaint herein.

47. Defendants have injured plaintiffs in violation of the federal Fair Housing Act by committing the following discriminatory housing practices:

A. Refusing to rent after the making of a bona fide offer; refusing to negotiate for the rental of, or otherwise making unavailable or denying, a dwelling to any person because of family status and/or disability in violation of 42 U.S.C. §3604(a);

B. Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of familial status, including without limitation forbidding children to play at any time in the complex, or in the provision of services or facilities in connection therewith, because of familial status in violation of 42 U.S.C. §3604(b);

C. Making, printing, or publishing notices, statements, or advertisements, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on familial status, or an intention to make any such preference, limitation, or discrimination in violation of 42 U.S.C. §3604(c);

D. Coercing, intimidating, threatening, or interfering with persons in their exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of, any right granted by or protected by the Fair Housing Act in violation of 42 U.S.C. §3617.

## SECOND CLAIM

### (California Fair Employment and Housing Act)

48. Plaintiffs reallege and incorporate by reference paragraphs 1 through 47 of the complaint herein.

49. Defendants have injured plaintiffs in violation of the California Fair Employment and Housing Act by committing the following discriminatory housing practices:

    A. Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of familial status and/or disability in violation of California Government Code §§12955(a);

    B. Making, printing, or publishing notices, statements, or advertisements, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on familial status and/or disability, or an intention to make any such preference, limitation, or discrimination in violation of California Government Code §12955(c);

    C. Expressing a preference for or limitation on a renter because of familial status and/or disability in violation of California Government Code §12955(d);

    D. Harassing, evicting, or otherwise discriminating against any person in the rental of housing accommodations where the dominant purpose is retaliation against a person who, among other things, has opposed practices unlawful under the Fair Employment and Housing Act, in violation of California Government Code §12955(f);

    E. Otherwise making unavailable or denying a dwelling based on discrimination because of familial status, in violation of California Government Code §12955(k); and

    F. Threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of familial status in violation of California Government Code §12955.7.

\* \* \*

\* \* \*

\* \* \*

# THIRD CLAIM

## (Negligence)

50. Plaintiffs reallege and incorporate by reference paragraphs 1 through 49 of the complaint herein.

51. Defendants owed plaintiffs a duty to operate the Subject Property in a manner that was free from unlawful discrimination, and to hire, train, supervise, and discipline their employees and themselves to fulfill that duty. Defendants negligently violated that duty by discriminating against families with children on account of their familial status. Defendants' violation of that duty was the result of negligence, including, but not limited to:

   A. Defendants' negligent failure to hire persons who were familiar with the requirements of state and federal fair housing laws;

   B. Defendants' negligent failure to train their employees and themselves regarding the requirements of state and federal fair housing laws;

   C. Defendants' negligent failure to supervise their employees regarding compliance with the requirements of state and federal fair housing laws; and

   D. Defendants' negligent failure to follow standard, recognized rental practices of the community;

   E. Defendants' negligent failure to exercise the ordinary and reasonable care and diligence required of a housing provider in the operation and management of the subject rental premises; and/or

   F. Defendants' negligent failure to discipline or terminate employees who failed to comply with the requirements of state and federal fair housing rights laws.

52. Such negligence was a substantial factor in causing plaintiffs' injuries. As a direct and proximate result of the aforementioned acts of defendants, plaintiffs have suffered damages.

## FOURTH CLAIM

### (Unfair Business Practices)

53. Plaintiffs reallege and incorporate by reference paragraphs 1 through 52 of the complaint herein.

54. In acting as herein alleged, defendants have engaged in a pattern or practice of unlawful discrimination in the operation of the Subject Property, a business establishment, and therefore have engaged in acts of unfair competition as the same is defined in California Business & Professions Code §17200 *et seq.*

## FIFTH CLAIM

### (California Unruh Civil Rights Act)

55. Plaintiffs reallege and incorporate by reference paragraphs 1 through 54 of the complaint herein.

56. Defendants have injured the plaintiffs in violation of the Unruh Civil Rights Act, California Civil Code §51 *et seq.* by discriminating against them and families with children in the operation of the Subject Property, a business establishment, because of familial status, and by retaliating against Plaintiffs for having taken efforts to file the current claim.

57. Pursuant to the Unruh Civil Rights Act, plaintiffs are entitled to statutory damages, among other remedies, of up to three times their actual damages as determined by the trier of fact, but no less than $4,000.00 for each violation by each defendants.

\* \* \*

\* \* \*

\* \* \*

# VII.

# **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for entry of judgment against defendants that:

1. Awards compensatory and punitive damages according to proof;

2. Declares that defendants have violated the provisions of the applicable federal and state fair housing laws;

3. Enjoins all unlawful practices complained about herein and imposes affirmative injunctive relief requiring defendants, their partners, agents, employees, assignees, and all persons acting in concert or participating with them, to take affirmative action to provide equal housing opportunities to all tenants and prospective tenants regardless of familial status;

4. Awards statutory damages to plaintiffs pursuant to the Unruh Civil Rights Act;

5. Awards pre-judgment interest and post-judgment interest as provided for by law;

6. Awards costs of suit herein incurred, including reasonable attorneys' fees; and

7. Awards all such other and further relief as the court may deem proper.

Dated: December 4, 2017                                         LAW OFFICES OF CRAIG P. FAGAN


By: **/s/Craig P. Fagan**
Craig P. Fagan
Attorneys for all Plaintiffs

# VIII.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby request a trial by jury.

Dated: December 4, 2017              LAW OFFICES OF CRAIG P. FAGAN


                                     By: **/s/Craig P. Fagan**
                                     Craig P. Fagan
                                     Attorneys for all Plaintiffs